# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 8, 2002

## STATE OF TENNESSEE v. RICKY RAY REED, JR., aka "RICCO"

**Direct Appeal from the Circuit Court for Tipton County**
**No. 3428     Joseph H. Walker, III, Judge**

---

### No. W2001-02155-CCA-R3-CD  - Filed June 25, 2002

---

The defendant was indicted for first degree murder and convicted by the jury of second degree murder. He filed a petition for post-conviction relief, and was permitted to make a delayed motion for a new trial, which ultimately was denied by the trial court. The defendant appeals the denial, arguing that the evidence at trial was insufficient to support his conviction for second degree murder. After a review of the record, we conclude that there was sufficient evidence to convict the defendant of second degree murder and that the trial court properly denied the defendant's motion for judgment of acquittal and a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Gary F. Antrican, District Public Defender, and David S. Stockton, Assistant District Public Defender, for the appellant, Ricky Ray Reed, Jr.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and James W. Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On November 3, 1997, the defendant, Ricky Ray Reed, Jr., was indicted for first degree murder for the March 11, 1997, killing of the victim, Tony Terrell Moss. A jury convicted him of second degree murder, a Class A felony, on May 5, 1998, and assessed a $50,000 fine. The trial court sentenced him as a violent offender to twenty years at 100% in the Tennessee Department of Correction. The defendant did not file a motion for a new trial or a notice of appeal.

On August 16, 1999, the defendant, utilizing a United States District Court form, filed a petition for writ of habeas corpus, arguing that the State violated his constitutional rights by failing

to disclose favorable evidence to him. The trial court dismissed the petition on September 9, 1999, and no appeal was filed. On June 25, 2001, the defendant filed a *pro se* petition for post-conviction relief, requesting a delayed appeal of his conviction and arguing that he was denied his right to appellate review under Tennessee Rule of Criminal Procedure 37(d) and (e), that he received ineffective assistance of counsel, and that he was denied due process. On July 5, 2001, the post-conviction court allowed the defendant to file a delayed motion for a new trial within thirty days and appointed the public defender's office to represent the defendant. The defendant timely filed a motion for judgment of acquittal and new trial, arguing that (1) the elements of second degree murder were not proven beyond reasonable doubt, (2) the evidence was insufficient to support his conviction for second degree murder, (3) the verdict of the jury was contrary to the law and the evidence, and (4) the sentence imposed by the court was excessive. The court denied this motion on August 9, 2001, and the defendant timely appealed. We conclude that the trial court properly denied the defendant's motion and the evidence was sufficient to convict the defendant of second degree murder.

## FACTS

On March 11, 1997, the defendant and his cousin, Billy Grandberry, were driving around Covington, Tennessee, when the defendant pulled up behind Corey Dean's parked car. The defendant pointed a shotgun at Dean, and once Dean saw the gun, he got in his car and tried to escape. The defendant followed Dean for a few minutes and then saw the victim, Tony Moss, and Dwayne Draine drive by. At that point, the defendant stopped following Dean and started following the victim and Draine. The defendant flashed money at the two men in an attempt to get them to stop.

The defendant, shotgun in hand, yelled at the victim and Draine to give him all of their money. Grandberry tried unsuccessfully to get the defendant to calm down. Because of the defendant's violent behavior, Grandberry exited the defendant's car at the next stop sign. The victim and Draine drove off, thinking that they finally had gotten away from the defendant. However, when the victim and Draine parked outside their home a few minutes later, the defendant suddenly appeared, pulled up beside their vehicle, stuck his shotgun out of the passenger window of his car, and shot the victim in the mouth.

At trial, the State's first witness was Rosie Williams, the victim's mother, who testified that the victim was 23 years old at the time of his death on March 11, 1997. She said he had two surviving children, one of whom was born one month after he was killed.

Billy Lee Grandberry, the defendant's first cousin, testified that on March 11, 1997, he and the defendant were riding around Covington in the defendant's mother's car, with the defendant driving and Grandberry riding in the passenger seat. Grandberry noticed that the defendant had bloodshot eyes and only talked to him when he asked him a direct question. Grandberry said the defendant began talking "crazy" and retrieved a shotgun from the backseat as they pulled up behind Corey Dean's vehicle. The defendant pointed the gun at Dean. When Dean realized a gun was

aimed at him, he drove away, and the defendant followed him. The victim and Dwayne Draine then drove by. When the defendant saw these two men, he stopped following Dean and started following the victim and Draine. The defendant said nothing to Grandberry as he followed the victim's car up Hill Street and down Simonton Street. The defendant flashed money at the victim, and the victim signaled to the defendant that he had drugs for sale. The defendant followed the victim's car to Simonton Street, where the two cars pulled up next to one another. The defendant yelled at the victim and Draine to give him all of their "cheese," which is slang for money. Grandberry said the defendant was "talking in his own world" by then, and he encouraged the defendant to leave the victim and Draine alone. The defendant replied that he "didn't give a fuck," and Grandberry told him to let him out of the car. As Grandberry got out of the car at the stop sign on Simonton Street, he noticed that the defendant had the shotgun in his hand. Grandberry went to a friend's house on Hill Street where he tried to call to the defendant's mother. As he was leaving his friend's house, Grandberry heard a gunshot.

Grandberry said that the defendant usually listened to what he said, but, on the day of the shooting, "[the defendant] wasn't his self [sic]." Grandberry described the defendant as follows: "[H]is eyes were just – they were wide open and was red, and he was just sitting there, and he was staring. He wasn't – he was just there, like he wasn't – you know, if you'd say something, he wouldn't – he didn't hear nothing you was saying."

Pearlie Currin testified that on March 11, 1997, she had parked her car on Craig Street while waiting for her granddaughter to pick up her school pictures. Currin described what happened after her granddaughter got out of the car:

> Well, I was just sitting there waiting on my granddaughter, and there was two guys in the car. Another car pulled up along side this car, and I thought maybe they was going to talk, until I seen something stick out of the window, and then I heard a shot. And my granddaughter ran to the car, she started screaming, and I got out of the car, screaming for her. And the car pulled off and liked [sic] to hit mine.

Currin could not identify the shooter because she did not see his face. However, she did say that the shooter was a black male. She said she never went to the car to see who had been shot.

John Terrell Sales testified that he learned that the victim had been shot, and he, Franklin Williams, and Eddie Poindexter were on their way to the hospital to see the victim when they encountered the defendant. Sales said the defendant, who was alone in his car, pointed a shotgun at them near the Midway Market at Mount Carmel. The defendant followed Sales's car from the Midway Market to Maple Street, a distance of about two or three miles. Sales did not know the defendant but thought that Williams and Poindexter knew him. Sales said that they were able to get away from the defendant when they stopped an officer on the road, and the defendant fled the scene. The three men told the officer that they were being chased by the defendant, who had a gun. Sales,

Williams, and Poindexter immediately went to the police station and gave statements about the incident.

Dwayne Draine testified that he was with the victim the day he died. Draine admitted that he had pled guilty to aggravated robbery in the Tipton County Circuit Court on December 2, 1994. The victim was driving the victim's mother's car, and Draine was riding in the passenger seat when they saw the defendant and Billy Grandberry on the afternoon of March 11, 1997. Draine said the defendant was hanging out of the window of his car and pointing a .12 gauge shotgun at them, which they initially thought was a toy gun. Draine described the actions of the defendant and Grandberry:

> [T]hey was flagging us down. They had like $10 or something in their hand, and they was flagging, trying to flag us down. And me and [the victim], we stopped on Simonton Street. And when we stopped on Simonton Street, [the defendant] and Billy [Grandberry] pulled up, and he was like, "Give me all your money." And [the victim] just looked at him.
>
> And he was like, "I'm for real." And he pulled the .12 gauge up, and he was like, "I'm for real. Give me all your money," said, "Go to your house and get your money right now."

At that point, Grandberry told them not to listen to the defendant because he was "high" and drunk. Hearing this, the victim did not take the defendant's threats seriously, and they turned onto Craig Street to go home. Draine then described what happened as they approached their house:

> A.   [A]s soon as we pulled in to park, [the defendant] just pulled up out of nowhere and stuck the .12 gauge out the window and shot.
>
> Q.   All right. Now, where were you in the car?
>
> A.   On the other side. On the passenger's side.
>
> Q.   And [the victim] was the driver?
>
> A.   Yeah.
>
> Q.   Now, the car that [the defendant] was driving, was it pulling towards you from an opposite direction or did it pull by you?
>
> A.   It pulled right up beside us, by us.
>
> Q.   All right. So the shotgun would have been put out which window of [the defendant's] car?

A. The passenger's side.

Q. All right. And how many shots were fired?

A. One.

Q. And where did that shot hit?

A. It hit [the victim] in the mouth, right about here.

Q. Okay. Well, what did you do?

A. I ducked. See, I didn't know if he had hit [the victim]. I just heard the shot, you know. When I ducked – I seen him shoot, and I ducked, and [the victim] took off. The car just took off, and it hit the back of my brother's car. And that's when I knew [the victim] had been shot, because the car kept rolling back down the street with [the victim] in it when his foot was still on the gas. And I put the car in gear. [The defendant] didn't pull off – he didn't speed off or anything. He just looked for a second, and then pulled off.

After the shooting, Draine said that he was not able to talk to the victim before he died. Draine left the scene of the shooting but later gave a statement to Investigator Chandler and another officer at the Covington Police Department. Draine said that less than five minutes had elapsed between the time that the defendant first pointed the gun at them on Simonton Street and the time that he shot the victim on Craig Street. The defendant said nothing before or after he shot the victim. After shooting the victim, the defendant waited for a few minutes before slowly driving away. Draine said that the defendant was not out of control that day and was not weaving or driving recklessly.

Dr. Thomas Deering, a forensic pathologist, testified that the cause of the victim's death was a shotgun wound to the head. He described the findings that led him to this conclusion:

In general, it hit on the left side of the face, adjacent to and near the mouth. It went from his left side towards his right side, and basically from the front towards the back. So all of the structures that are in the area were affected. The jaw was broken. The maxillary bone, or the cheek bone, was broken. The tongue was lacerated, inside of the mouth was lacerated. The bone that holds the brain, called the base of the skull, was fractured because of the blast of the shotgun wound.

-5-

Dr. Deering stated that the victim's blood-alcohol level was .03 grams per deciliter at the time of the autopsy and that the victim's body tested negative for drugs. A copy of the autopsy report was entered into evidence.

Ricky Chandler, an investigator for the Covington Police Department, testified that on March 11, 1997, he was called into the station on his day off to investigate the shooting death of the victim. Investigator Chandler said he was unable to visit the scene but started collecting information from witnesses about the identity of the shooter and what had happened. Between 5:00 and 5:30 p.m. that afternoon, Chandler received a call concerning the shooter's whereabouts. At about 6:00 p.m., he went to the defendant's girlfriend's residence on Gillespie Street. When the police approached her house, the defendant ran out the back door, and the officers were unable to apprehend him. Chandler and other officers searched the area around the house and discovered the car used by the defendant in the shooting. Inside the car, which was located about seventy-five yards from the defendant's girlfriend's house, was a .12 gauge shotgun matching the description of the murder weapon. Chandler identified the shotgun that he recovered from the backseat of the car, and a photograph of the shotgun was entered into evidence. Chandler said he found four unspent rounds of number 5 shot in the weapon, and these four shells were also entered into evidence.

Investigator Chandler further testified that at approximately 11:00 p.m. on March 11, 1997, the defendant's father brought the defendant to the police station. The defendant appeared to be in good physical condition and appeared to be acting normal emotionally. Chandler said the defendant did not appear to be under the influence of any alcohol or drugs at that time. Chandler advised the defendant of his Miranda rights, and the defendant signed an admonition and waiver of rights form at 10:58 p.m. Chandler said the defendant appeared to understand his rights at the time he signed the waiver.

Chandler said the defendant then gave a statement, which was recorded on audiotape. This tape was played to the jury and entered into evidence. In the defendant's taped statement, he admitted shooting the victim on Craig Street:

> Chandler: All right Ricky, I want you to go over the circumstances around the situation that happened this evening about . . . right around 5:00 this evening with the incident that happened on Craig Street. Tell me what was going on and what your intentions were and what was going on.
>
> Defendant: He was a drug dealer.
>
> Chandler: So . . . and what happened? Because he was a drug dealer, what did you do?
>
> Defendant: He got shot.

Chandler: Did you shoot him?

Defendant: Yes.

Chandler: What did you shoot him with?

Defendant: A .12 gauge.

Chandler: All right, tell me what happened. What did you do? How did it happen? . . . Were you in your car?

Defendant: I pulled up beside him.

Chandler: Okay. Did you shoot through your, the driver's door or did you shoot through the passenger window?

Defendant: The passenger window.

Chandler: So you pulled up on the driver's side of his car, going the same direction, then?

Defendant: Yep.

Chandler: You put the shotgun in the driver-passenger window and pulled the trigger?

Defendant: Yes.

Chandler: What did you do after that?

Defendant: I left.

. . . .

Chandler: Are you on any kind of medication now, Ricky? Do you take any medicine?

Defendant: The medicine's at home.

Chandler: Have you been taking it?

Defendant: Off . . . every now and then.

Chandler: Have you had any today?

Defendant: No.

Chandler: How long has it been since you had any?

Defendant: Probably about two or three days.

Chandler: How come you quit taking it?

Defendant: I don't like taking medicine.

Chandler: What's it for?

Defendant: My nerves and when I got shot and stuff.[1]

After the tape was played for the jury, Chandler testified that during his questioning of the defendant, he recovered six number 5 shot shotgun shells from the defendant's jacket pockets. These six shells were entered into evidence.

Investigator Chandler said that he had been in law enforcement for eleven years, and eight of those eleven years he had focused on drug trafficking. He stated that the victim had never been arrested for dealing drugs by the Covington Police Department.

During cross-examination, Chandler stated that Dwayne Draine's and Corey Dean's names had come up several times when the police department had conducted drug investigations in the past. Chandler also stated that Franklin Williams, Eddie Poindexter, and John Terrell Sales had current drug cases pending against them. Chandler said he first met the defendant when he was arrested for drugs as a juvenile. Chandler next saw the defendant when he was arrested on a felony drug charge. The police department offered the defendant a chance to be a confidential informant so that he could reduce his felony drug charge. Chandler said that the police department used the defendant as an informant only one time:

> Q. When you said you "had him hooked up," that was a situation where he was wearing a transmitting device, wired up as an agent; would that be correct?
>
> A. Correct.

---

[1] Although the defendant's statement contains additional information about his actions on March 11, 1997, this information is not relevant to the issue on appeal.

Q. And what was it about his remarks that caused you concern for continuing to employ him?

A. Well, after the intended target [Franklin Williams] was a no-show on it, he was riding around, and I was a little piece behind him in my vehicle listening, and he made the remark if I got him a gun, he would go kill Gangster Al.

Q. And who would Gangster Al be?

A. That's a subject, Edison Williams, that we've had some dealings with in the past on drug trafficking.

At that point, I put the blue lights on him, got him out of the car, took the Kel set, which is the transmitting device, off of him. I had given him $60 to make a purchase. I took $40 of that back, let him keep $20 of it for gas money, and told him I didn't need his services anymore.

Chandler said he terminated the defendant's confidential informant services on January 17, 1997. Chandler later talked to the defendant again when the defendant asked to be an informant a second time. Chandler denied his request. During that conversation, the defendant said that if Chandler would get him a weapon, he would kill T.J. Hurt, another drug dealer in the Covington area.

Defense counsel then requested that Chandler's transcription of the defendant's statement be entered into evidence. The court allowed it to be admitted as an exhibit, but stated the following:

Ladies and gentlemen, the tape that you've heard would be what you are to consider. The Court will allow a copy of what purports to be a transcription of the tape to be marked as an exhibit for your aid and benefit, but if you find that the transcription differs with what you recall on the tape, you're to go by your memory of what was on the tape.

At the conclusion of Chandler's testimony, the State rested its case in chief. The defendant elected not to testify.

The defendant's mother, Sharon Reed, was the only witness testifying for the defense. She testified that the defendant had been receiving psychiatric counseling since 1994 and had been prescribed five or six different types of medication. She could tell if the defendant had been taking his medication by the way he acted. Reed said the defendant's attitude and personality had changed

during the weeks prior to March 11, 1997. She said that she had pled guilty to forgery in Mississippi in 1998.

The trial court instructed the jury as to first degree murder and the lesser-included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide. The jury found the defendant guilty of second degree murder.

## ANALYSIS

### Sufficiency of the Evidence

The defendant appeals the trial court's denial of his motion for a judgment of acquittal and a new trial. In his appeal, the defendant argues that the evidence at trial was insufficient as a matter of law to convict him of second degree murder, saying that he did not knowingly kill the victim since "he had no understanding of what he was doing or what was going on around him." Alternatively, he argues that his conviction should be reduced to voluntary manslaughter.

Where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). See also State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

Jury verdicts in criminal cases are given considerable weight by the reviewing court. A guilty verdict that is approved by the trial judge accredits the testimony of the State's witnesses and resolves all conflicts in favor of the theory of the State. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). A guilty verdict removes the defendant's initial presumption of innocence and

replaces it with a presumption of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

First, the defendant argues that he did not knowingly kill the victim, claiming that he had not taken his medication "for his nerves" for several days prior to the shooting. As additional proof of his mental state at the time of the shooting, he points to Billy Grandberry's testimony that he was talking and acting crazy the day of the shooting and to Dwayne Draine's testimony that he just sat there after shooting the victim instead of quickly fleeing the scene.

Tennessee Code Annotated section 39-13-210(a)(1) defines second degree murder as "[a] knowing killing of another." "Knowing" is defined as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result[.]

Tenn. Code Ann. § 39-11-106(a)(20) (1997). Voluntary manslaughter, which the defendant argues that he committed, is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (1997).

In order to establish second degree murder, the State must prove that a killing was knowing beyond reasonable doubt. See Jackson v. Virginia, 443 U.S. at 319, 99 S. Ct. at 2789, 61 L. Ed. 2d at 573. Substantial evidence was presented at the defendant's trial to prove beyond a reasonable doubt that he knowingly killed the victim. Billy Grandberry, the defendant's first cousin, testified that the defendant first aimed his shotgun at Corey Dean before brandishing the gun and yelling at the victim and Dwayne Draine to give him all of their money. Grandberry stated that the defendant was holding the shotgun in his hand when Grandberry exited the car. A few minutes after leaving the car, Grandberry heard a gunshot and never saw the victim alive again. Dwayne Draine, who was in the passenger seat of the victim's car when the victim was shot, testified that the defendant aimed a shotgun at him and the victim and demanded their money. Minutes later, as Draine and the victim were about to park outside their house on Craig Street, the defendant suddenly appeared, pulled beside their car, and shot the victim in the face.

Draine's testimony is supported by the testimony of Pearlie Currin, another eyewitness to the shooting. Currin stated that she saw a black male fire a shotgun into a car carrying two individuals on Craig Street. John Terrell Sales testified that on March 11, 1997, he encountered the defendant, who aimed a shotgun at him and the passengers in his car and chased after them as they

were en route to the hospital where the victim had been taken. Dr. Thomas Deering testified that the victim died as a result of a shotgun wound to the head.

Investigator Chandler testified that at about 6:00 p.m. on March 11, 1997, he saw the defendant run from his girlfriend's house in an effort to escape from the police. A short time later, Chandler and other officers found the defendant's car, with the shotgun locked inside. At trial, the audiotape of the defendant's statement, in which he confessed to shooting the victim, was played for the jury. We conclude that the evidence is sufficient to show that the defendant knowingly killed the victim.

Alternatively, the defendant argues that even though the jury concluded that he acted knowingly, he should have been convicted of voluntary manslaughter instead of second degree murder because he killed the victim as a result of the victim's provocation. The defendant highlights evidence showing that he was infuriated with drug dealers and that the victim's signal to him that he had drugs for sale was an act of provocation sufficient to sustain a conviction for voluntary manslaughter. However, the transcript of the trial reflects that the jury was instructed on the elements of first degree murder and the elements of the lesser-included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide.[2] Thus, the jury had the option of convicting the defendant of the lesser-included offense of voluntary manslaughter but chose to convict him of second degree murder. In making this decision, the jury rejected the defendant's argument that he shot the victim in an act of passion resulting from adequate provocation. The jury had every right to reject this argument. See State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001) (citing State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); Wilson v. State, 574 S.W.2d 52, 55 (Tenn. Crim. App. 1978)). Based on the evidence in the record and considering the evidence in a light most favorable to the State, we conclude that a rational trier of fact could have found the elements of second degree murder beyond a reasonable doubt. The evidence is sufficient to support the defendant's conviction for second degree murder.

## CONCLUSION

Based on the foregoing reasoning and authorities, we conclude that there was more than sufficient evidence to convict the defendant of second degree murder, and affirm the judgment of conviction.

_____
ALAN E. GLENN, JUDGE

---

[2]The transcript of the trial shows that the both the State and defense counsel agreed with the trial court that the jury should be instructed on the following offenses: first degree murder, second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide.